UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 03-CV-3074 (JFB) (LB)

———————

JUAN LUIS FIGUEROA,

Plaintiff,

VERSUS

ANAT WEISENFREUND, JUDITH DAVISON, AND EARLY
INTERVENTION AND DEVELOPMENT DISABILITIES,

Defendants.

———————

MEMORANDUM AND ORDER
December 8, 2006

———————

JOSEPH F. BIANCO, District Judge:

Plaintiff Juan Luis Figueroa brought this action *pro se* pursuant to 42 U.S.C. § 1983 against defendants Anat Weisenfreund, Judith Davison and Early Intervention and Development Disabilities (collectively "defendants"). Plaintiff alleges that defendants violated his First Amendment rights by terminating his employment as an Early Intervention Official Designee ("EIOD") at the New York City Early Intervention Program ("EIP") after he spoke out about defendants' alleged "preferential treatment" toward "Orthodox Jewish providers" who allegedly discriminate against black and Hispanic children and families. For the reasons that follow, defendants' motion for summary judgment is granted.

I. BACKGROUND

A. FACTS

The facts, construed in a light most favorable to plaintiff, the non-moving party, *see Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005), are as follows[1]:

———

[1] Defendants complied with Local Rule 56.1 and 56.2 by providing notice to *pro se* plaintiff. However, plaintiff failed to comply with the local rule and did not provide a counter-statement. Instead, plaintiff engaged in his own recitation of the facts. Although the Court will draw every

The EIP is a grant funded program, formerly administered by the New York City Department of Health and Mental Hygiene ("DOHMH"), that is now administered by the New York City Health and Hospitals Corporation ("HHC"). The EIP provides a number of services including, but not limited to, special education, occupational therapy, physical therapy, and speech therapy to developmentally delayed children between the ages of birth to three-years-old. (Decl. of Illana A. Eck (hereinafter "Eck Decl.") Ex. B at 86-87.)

Plaintiff began working at the EIP on or around December 18, 1998 as an EIOD. (*Id.* at 79-80.) In that position, plaintiff's responsibilities included reading evaluations from providers to monitor services requested and received by the children, attending Initial Family Service Plan meetings ("IFSP"), reviewing and approving paperwork, communicating with families, service coordinators and providers, and attending training and staff meetings. (Eck. Decl. Exs. B at 84-85 and D.)

### 1. Plaintiff's Work Performance and Disciplinary History

Plaintiff received an evaluation in May 1999 that covered the period to that date from the beginning of plaintiff's employment at EIP in December 1998. (Eck. Decl. Ex. D.) In the evaluation, plaintiff received a "satisfactory" rating. (*Id.*) Among the comments included in the evaluation were that plaintiff "is receptive to new ideas and instructions" and that he "usually fulfills his commitments . . . [and] is reliable and seeks super-visor's [sic] help if needed." (*Id.*) The evaluation also suggested the following plans for improvement: (1) "[plaintiff] needs to avoid missing staff meetings which can provide on-going training; (2) continued discussion on child development supervision with staff supervisor - supervisor will provide hand-outs to be read; (3) continue to develop a tactful and diplomatic relationship with service coordinators and providers." (*Id.*) The evaluation was signed by plaintiff's supervisor at the time, Judie Pierre-Louis. (*Id.*)

On May 4, 2000, plaintiff attended a supervisory conference with Assistant Regional Director Jeanne Clancy, Ph.D. (Eck. Decl. Ex. E.) The supervisory conference was prompted by plaintiff's refusal to meet with a parent because a parent had arrived at an evaluation forty minutes late, despite the fifty minutes that remained before the next appointment was to begin. (*Id.*; Eck. Decl. Ex. B at 140.) In a memorandum written on May 23, 2000 by Clancy to summarize the conference, Clancy noted "the inappropriate nature of [plaintiff's] action" as well as plaintiff's "dismissive manner" toward Clancy's direction. (Eck Decl. Ex. E.) Clancy also discussed her concerns regarding plaintiff's "ongoing difficulties in accepting direction" and established a weekly meeting with plaintiff for supervision. (*Id.*)

---

inference in plaintiff's favor, *see Pender v. N.Y. Office of Mental Retardation & Developmental Disabilities*, 2006 U.S. Dist. LEXIS 48751, No. 02-CV-2438 (JFB) (LB), 2006 WL 2013863, at *1 (E.D.N.Y. July 18, 2006) (overlooking *pro se* plaintiff's failure to comply with Local Rule 56.1 when there is evidence in the record to support plaintiff's position and citing cases), the Court rejects plaintiff's "conclusory allegations" that are not based in the record. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984); *Raheim v. N.Y. City Bd. of Educ.*, No. 95-CV-4599, 97-CV-3687 (JFB) (CLP), 2006 U.S. Dist. LEXIS 57780, at *2 (E.D.N.Y. Aug. 17, 2006).

On August 28, 2000, plaintiff received his annual performance evaluation for the period from July 1, 1999 to June 30, 2000, which was prepared by Clancy. (Eck. Decl. Ex. F.) Plaintiff received a "satisfactory" evaluation that stated plaintiff is "committed to his job," that he "is very productive," "is eager to learn more about child development," and that plaintiff "relates well to fellow EIODs." (*Id.*) The evaluation, however, specifically noted that plaintiff needs improvement "in areas of judgment and adaptability" which "is crucial to future satisfactory evaluations." (*Id.*) More specifically, it noted that:

> Mr. Figueuroa has some difficulty handling professional interactions with parents [and] providers. On occasion he has responded impulsively [and] in a less than compassionate manner. Improvement is needed in this area.

\* \* \*

> Mr. Figueroa shows some difficulty in using appropriate judgment in relation[] to supervisors. This has been an ongoing issue in supervision. At times his responses to providers have also not been well thought-out. A supervisory conference was held to address this with employee during evaluation period.

\* \* \*

> Mr. Figueroa demonstrates some difficulty accepting direction. When subject is of interest to [plaintiff] he shows good learning skill: However, he has shown significant resistance to direction when it does not coincide with his views. Improvement is needed in this area.

(*Id.*)

On March 28, 2001, plaintiff attended an IFSP meeting held for twins at Jumpstart Early Intervention's site. (Eck. Decl. Ex. G.) Complaints were made regarding plaintiff's behavior at that meeting (hereinafter "March 21, 2001 Complaint") which were summarized by a memorandum dated May 8, 2001, from Anat Weisenfreund, Brooklyn Regional Director, following a supervisory meeting held by Weisenfreund with plaintiff on April 27, 2001 in response to the complaints. (*Id.*) The memorandum reported:

> Cynthia Winograd [from Jumpstart] stated that she had been informed by Mr. Neil Weinstein (evaluation representative at said meeting) and by Service coordinator Rachel Goldenberg that Mr. Figueroa had behaved very unprofessionally during this IFSP for twins and that as a result the children's mother was "shaken up," and the attending professionals were very disturbed by [plaintiff's] inappropriate statements and loss of temper. Mr. Weinstein was so disturbed by the happenings at this IFSP that he called Ms. Winograd at home to report the occurrences.

Weisenfreund received a phone call from the mother of the twins who related the same series of events and complaints that were reported by Weinstein. (*Id.*) With respect to the summary of Weisenfreund's meeting with plaintiff, Weinsenfreund reported that:

> [She] informed Mr. Figueroa that since he has behaved contrary to his role on a good number of occasions in the past and is apparently continuing to display grossly inappropriate behavior despite extensive feedback and supervision, that [she] intend[ed]

3

to pursue further disciplinary action with the goal of terminating his employment with [the EIP].

(*Id.*) On May 8, 2001, Weisenfreund received a written complaint from Neil Weinstein, a Jumpstart Social Worker, regarding the March 28, 2001 meeting events. (Eck Decl. Ex. H.) The mother of the children also made a written complaint regarding plaintiff's behavior at the meeting. (Eck Decl. Ex. I.) Her complaint stated:

> I recently had an IFSP meeting to get speech therapy for my children. [Plaintiff] was there. I was very offended by some comments that he made, such as when I asked if my children could get speech 3x a w[ee]k he told me I was abusing the system. He also rushed me and kept on asking me if I wanted to reschedule my meeting. I found [plaintiff] to be very impatient. He insisted that I go to mediation to request more therapy for my children. Although a speech therapist evaluated my kids [and] recommended speech, [plaintiff] told me that in his opinion they needed physical therapy, not speech therapy.

(*Id.*)

On April 3, 2001, Assistant Regional Director Glenda Carmichael spoke with a parent of a child in the program who complained that her son's speech therapy services had been reduced from four times per week to two times per week (hereinafter "April 3, 2001 Complaint"). (Eck Decl. Ex. J.) On April 4, 2001, Carmichael held a supervisory conference with plaintiff, which was summarized in a May 2, 2001 memorandum. (*Id.*) In her memorandum, Carmichael summarized that she had informed plaintiff that he "[was] wrong to change the child's authorization form and decrease services without having a discussion with the child's therapist and permission from the mother," "that these types of non-collaborative actions are unacceptable for an EIOD and that this cannot occur again." (*Id.*) Carmichael also noted plaintiff's "limited insight into the inappropriateness of [his] actions." (*Id.*)

On May 10, 2001, Director of Regional Services Judith Davison held a counseling session with plaintiff to discuss the March 21, 2001 Complaint and the April 3, 2001 Complaint. (Eck Decl. Ex. K.) Present at the meeting were plaintiff, his union representative, Carmichael, Weisenfreund and Davison. (*Id.*) The memorandum dated June 1, 2001, summarizing the meeting, stated that "[plaintiff] appears to have a misunderstanding of both the role of the EIOD and the nature of [t]he Early Intervention Program." (*Id.*) Davison also stated in the memorandum:

> [Plaintiff's] failure to understand the role and responsibilities of the EIOD after more than two (2) years on the job is of grave concern. There appears to be an escalating pattern of inappropriate conduct on the job. Previous supervisory conferences were held on May 4, 2002, April 3, 2001 and April 27, 2001. Previous evaluations of [plaintiff], although satisfactory, indicate difficulty in handling professional interactions with parents and providers, as well as judgment and accepting direction from supervisors. In justifying his actions at this IFSP and in a previous situation where he arbitrarily reduces services without parental consent and contrary to the treating therapist's recommendations, [plaintiff] said he knows child development.

4

At this counseling session, [plaintiff] was warned that any repetition of inappropriate conduct on the job will result in further disciplinary action, including a recommendation for termination.

(*Id*.) Corrective actions agreed to at the meeting included close supervision by plaintiff's immediate supervisor, Carmichael, that plaintiff would be accompanied to IFSPs and that plaintiff would attend basic EIOD training. (*Id*.)

On July 11, 2001, another supervisory conference was held because plaintiff was cited for failure to follow procedures and instructions regarding billing waivers. (Eck. Decl. Exs. B at 155, C.)

On July 19, 2001, Carmichael received another complaint from another provider, stating that plaintiff had failed to process authorization paperwork for bus transportation services for a child. (Eck Decl. Exs. C, M.) As a result of plaintiff's failure to process necessary paperwork, the child was denied transportation services for several days. (*Id*.)

On July 25, 2001, plaintiff received a copy of his annual performance evaluation covering his period of employment from July 1, 2000 to June 30, 2001. (Eck Decl. Ex. N.) The evaluation, prepared by Carmichael, gave plaintiff a rating of "needs improvement." (*Id*.) Specifically, it stated:

> Despite regular supervision and efforts by supervisors [plaintiff] continues to display great difficulty in the areas of relations with patients/public, judgment and adaptability[.] [Plaintiff] still seems not to understand the role of the EIOD and during this rating period there have been two supervisory conferences (April 4, May 8[]), as well as one counseling session (May 10, 2001) regarding job performance. He will be reevaluated in three months.

(*Id*.) Carmichael also noted that plaintiff did not follow office procedures when plaintiff failed to call his supervisor after his last field assignment before going home on July 31, 2001. (Eck Decl. Ex. C.) Rather, plaintiff called from his house, despite a memorandum given to all EIODs dated July 19, 2001, requiring EIODs to call their supervisor from their office upon completion of their last field assignment prior to 5:00 p.m. (*Id*.; Eck Decl. Ex. O.)

2. Plaintiff's Termination

On July 31, 2001, plaintiff was served with a Notice and Statement of Charges. (Eck Decl. Ex. P.) Plaintiff was charged with misconduct, and the notice specifically stated:

> (1) Poor job performance. For the period July 1, 2000 to present you have been performing your job duties less than satisfactory as an EIOD.

(*Id*.) On October 10, 2001, a Step 1(A) informal conference was held, pursuant to the Collective Bargaining Agreement, to discuss the charge of poor work performance. (Eck Decl. Ex. C.) Present at the meeting were plaintiff, Ken Berman, Union Representative, Organization of Staff Analysts, Anat Weisenfreund, Brooklyn Regional Director and Assistant Regional Director, Glenda Carmichael, Jeanne Clancy, Queens Regional Director, Nellie Mitchell, Personal Program Development Specialist, Central Office, and Beverly Lewin, Deputy Director, Personal Labor Relations Officer, who served as hearing officer. (*Id*.) At the conference, Weisenfreund stated that the department had experienced three major problems with

5

plaintiff over the last year, namely, difficulties with: (1) handling professional interaction; (2) appropriate judgment; and (3) accepting direction. (*Id.*) After the list of grievances was set forth, the hearing officer made the following determination in a November 7, 2001 order:

> Based on the facts presented at the Step 1(A) Hearing and a review of the documents and records presented, it has been determined that the charge is sustained as noted in the Notice and Statement of Charges. Progressive Disciplinary procedures were followed and great efforts were made to assist and support [plaintiff]. It is, therefore, the recommendation of this hearing officer that [plaintiff's] services as an Early Intervention Official Designee should be terminated.

(*Id.*) The order further provided that:

> Within 10 days of receipt of this recommendation, [plaintiff] may elect to:
>
> (A) Accept the Hearing Officer's recommendation
>
> (B) Proceed under contractual grievance procedure.

(*Id.*) On November 8, 2001, plaintiff submitted a Waiver of Section 75 Hearing and Election of Grievance Procedure, stating that he refused to accept the decision and penalty of termination recommended against him. (Eck Decl. Ex. Q.) By letter dated November 15, 2001, plaintiff was notified that his employment was terminated for poor work performance, effective at the close of business Friday, November 16, 2001. (Eck Decl. Ex. R.)

### 3. Plaintiff's Allegations Concerning an Alleged Violation of His First Amendment Rights

Plaintiff alleges that, in or around February 2000, plaintiff became aware of defendants' alleged preferential treatment toward Orthodox Jewish Providers that only served their communities. (Compl. ¶ 3; Pl.'s Ex. 13 at 59.) Plaintiff alleged that he shared his views with supervisors Clancy, Weisenfruend, and Carmichael. (*Id.*; Pl.'s Ex. 13 at 30, 44-45.) In or around April 2000, plaintiff alleges that he expressed views and concerns regarding unnecessary and "frivolous" service requests by some agencies. He also alleges that in or around June or July 2000, he expressed his view openly at staff meetings that "Orthodox Jewish Providers were not taking black or Hispanic children in their centers, and that 'the requests for services were money oriented and not what was clinically appropriate for children.'" (Compl. ¶ 4; Pl.'s Ex. 13 at 47, 51.) According to plaintiff, he also expressed these views at the Annual Convention of NYC EI NYS Dept. of Health. (Compl. ¶ 4.) Plaintiff alleges that his expression of his views coincided with the complaints regarding his conduct and that he was ultimately terminated for complaining about the alleged discriminatory practices he observed in the field as an EIOD. (*Id.* ¶¶ 4-6; Pl.'s Ex. 13 at 55.)

At his deposition, plaintiff testified that, after he received his August 2000 evaluation, he stopped being "so open" when speaking about his views. (Eck Decl. Ex. B at (D2) 114.) However, plaintiff also testified that he "didn't completely stop, [he] was more careful." (Pl.'s Ex. 17.) In the position statement served to the New York City Commission on Human Rights in response to plaintiff's allegations, Weisenfreund and Davison responded that they never had a

conversation with plaintiff regarding any alleged disparity in services provided to the Orthodox Jewish community over Hispanic or Black communities. (Eck Decl. Ex. U.)

4. Plaintiff's Discrimination Charge

On June 28, 2001, plaintiff filed a complaint with the New York City Commission on Human Rights (hereinafter "CCHR") alleging discrimination. (Eck Decl. Ex. S.) Plaintiff alleged that, starting in or around January 2000, plaintiff stated to Davison and Weisenfreund that EID was "favoring the needs of the Orthodox Jewish community over those of the Hispanic and/or black communities" and that, as a result, Davison and Weisenfreud cited him for "unsubstantiated performance deficiencies, making reference of a homophobic nature to [plaintiff's] personal life, friends, and activities, and threatening to terminate his employment." (*Id.*) HHC submitted its rebuttal statement on July 23, 2001. (Eck Decl. Ex. U.) After plaintiff's termination, on November 16, 2001, plaintiff filed a second complaint with the CCHR, alleging retaliation against plaintiff by terminating his employment because of his opposition to discriminatory practices. (Eck Decl. Ex. T.) In response to this second charge of discrimination, HHC submitted a rebuttal to CCHR with attachments on December 21, 2001. (Eck Decl. Ex. V.)

On January 17, 2003, CCHR issued a Determination and Order After Investigation, finding "no probable cause to believe that the respondents engaged in the unlawful discriminatory practices alleged" in plaintiff's June 28, 2001 charge. (Eck Decl. Ex. W.) Also on January 17, 2003, CCHR issued a no probable cause finding with respect to plaintiff's November 16, 2001 charge of retaliation. (Eck Decl. Ex. X.) Plaintiff appealed the CCHR's no probable cause determination regarding his termination, which was received by CCHR on December 21, 2002. (Eck Decl. Ex. Y.) By letter dated January 27, 2003, defendant submitted additional material to CCHR concerning defendants alleged favoritism of Orthodox Jewish providers. (*Id.*) On June 19, 2003, the CCHR issued a Determination and Order After Review, affirming the finding of no probable cause set forth in the Determination and Order After Investigation. (Eck Decl. Ex. Z.)

B. PROCEDURAL HISTORY

Plaintiff commenced the instant action on June 23, 2003. On February 2, 2004, plaintiff amended his complaint to delete the claim of unequal treatment, discrimination, or retaliation based on plaintiff's sexual orientation. Pursuant to this Court's rules, defendants filed a fully submitted motion for summary judgment, along with plaintiff's opposition and accompanying exhibits on April 26, 2006. The parties declined oral argument on the motion. However, by letter dated July 29, 2006, *pro se* plaintiff attempted to make additional arguments and submit additional exhibits in furtherance of his opposition without leave of the Court to file such sur-reply.

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006).

The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

Finally, "[w]here the non-moving party is proceeding *pro se*, the court must interpret that party's supporting papers liberally, that is, interpret them 'to raise the strongest arguments that they suggest.'" *Forsyth v. Fed'n Empl. & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

III. DISCUSSION

In order to survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must put forth evidence that demonstrates: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006). However, defendants may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.*

Defendants do not contest that plaintiff's termination was an adverse employment action, nor do defendants argue that the speech by plaintiff regarding preferential treatment of Orthodox providers is not a matter of public concern; rather, defendants argue that plaintiff cannot demonstrate a causal connection between his speech and the termination. Defendants further argue that,

8

even if plaintiff could establish all three elements of a First Amendment retaliation claim, plaintiff's claim must fail because defendants have demonstrated that they would have taken the same adverse employment action against plaintiff regardless of plaintiff's speech.

### A. PLAINTIFF CANNOT ESTABLISH A CAUSAL CONNECTION

Plaintiff must demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)). This causal connection can be demonstrated by plaintiff "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). Furthermore, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.'" *Cobb*, 363 F.3d at 108 (quoting *Morris*, 196 F.3d at 111).

At plaintiff's deposition, plaintiff stated that after his August 2000 evaluation, he was "not . . . so open when . . . speaking about [his] views" and "more careful to be less vocal about it." (Eck Decl. Ex. B at (D2) 114; Pl. Ex. 16 at 48.) He also testified, however, that he spoke out at a staff meeting in early 2001. (Pl.'s Ex. 16 at 53.) Though the exact date of the latest staff meeting at which plaintiff allegedly spoke is unclear, approximately six months passed before plaintiff was served on July 31, 2001, with the Notice and Statement of Charges. Plaintiff's termination did not occur until November 2001, nearly fifteen months after plaintiff admitted he refrained from vocalizing his views, and just under a year after the early 2001 staff meeting. While there is no "bright-line" rule for establishing a sufficient temporal link, this significant lapse of time between plaintiff's speech and the alleged retaliation is insufficient to establish the required causal connection in this case. *See King v. Bratton*, No. 96-CV-1131 (RJD), 2004 U.S. Dist. LEXIS 26011, at *32 (E.D.N.Y. Aug. 25, 2004) (holding that an eleven month lag between plaintiff's comments and alleged retaliation fails to suggest the necessary causal link); *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 314 (E.D.N.Y.2003) ( "[T]he interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months."); *but see Berhardt v. Interbank of N.Y.*, 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (finding that while an eleven month passage time of "would suggest strongly the absence of a causal link, such an inference [was] not . . . compelled by the available evidence such that the Court could resolve the claim as a matter of law"). In the instant action, the passage of time after plaintiff allegedly spoke out in early 2001, until plaintiff was served with a Notice and Statement of Charges in July 2001, is more significant given the events that occurred during that interim time. Plaintiff's termination followed a series of complaints against plaintiff for his unsatisfactory job performance. These complaints came not only from plaintiff's supervisors, but also parents and providers. The evidence demonstrates a nexus between plaintiff's unsatisfactory job performance and the adverse employment action. Plaintiff has failed, however, to point to evidence that would establish a causal connection between his speech and the adverse employment action beyond mere conclusory allegations. *See Oliphant v. Conn.*

*DOT*, No. 02-CV-700 (PCD), 2006 U.S. Dist. LEXIS 77021, at *31-*32 (D. Conn. Oct. 20, 2006) ("The operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two.").

In response to defendants' argument and in an effort to establish a causal connection, plaintiff cites to a letter from plaintiff to the commissioner, among others, dated May 5, 2001. (Pl.'s Ex. 3.) Plaintiff also cites to the memorandum from Weisenfreund to Davison dated May 8, 2001, summarizing the events surrounding the meeting she held with plaintiff on April 27, 2001. (Defs.' Ex. G.) The letter to the commissioner appears to have been written by plaintiff in response to the meeting plaintiff had with Weisenfruend on April 27, 2001. In that letter, plaintiff expressed concern about how the disciplinary meeting was handled and expressed his general belief that the "system is being abused and misused by different providers [and that] [t]he system is replacing or being used as Day Care, Pre-School and in many cases sold as 'baby sitting.'" (Pl.'s Ex. 3.) Plaintiff emphasized his position that he believed the system was being abused and that parents were making unreasonable demands. (*Id.*) Plaintiff wrote a follow-up letter on June 9, 2001, again expressing concerns about his treatment and requesting an investigation of the complaints against him. (*Id.*)

Contrary to plaintiff's assertion, though plaintiff's letters and the meeting with Weisenfruend were more proximate in time to plaintiff's termination date, neither mentioned the subject of plaintiff's alleged protected speech. Because neither the letters to the commissioner nor the memorandum by Weisenfreund mentioned alleged favoritism of the Orthodox Jewish providers, they do not serve to bridge the proximity gap between plaintiff's termination and when plaintiff allegedly spoke out on the matter of public concern. In addition, the matters that are discussed in the letters do not qualify as constitutionally protected speech. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as a employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personal decision." *Connick v. Myers*, 461 U.S. 138, 147 (1983). To determine whether an employee's speech addresses a matter of public concern, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999); *see also Ezekwo v. N.Y. Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (holding that plaintiff's complaints did not address matters of public concern because they were "personal in nature and generally related to her own situation within [the] program"); *cf. Reuland v. Hynes*, 460 F.3d 409, 418 (2d Cir. 2006) (holding that a statement involved a matter of public concern where it "did not relate to employment policies or other internal workplace grievances" and because it "was made in an interview with a magazine with public circulation and not simply to co-workers"). Plaintiff's letters focus on his individual employment situation, *i.e.*, his personal grievances and dissatisfaction with how he was treated by Weisenfreund. Such matters are not of public concern. *See Lewis*, 165 F.3d at 164 ("[S]peech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern."). Accordingly, the evidence to which plaintiff points does not remedy plaintiff's failure to establish a causal connection between his protected speech and his eventual

termination.[2] Thus, because the record is devoid of evidence demonstrating a causal connection between plaintiff's speech and the subsequent action toward him, no reasonable jury could find that this requisite nexus has been met. Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's retaliation claim.[3]

## B. DEFENDANTS WOULD HAVE TERMINATED PLAINTIFF REGARDLESS OF THE SPEECH

"When a public employee shows that protected speech was a 'motivating factor' in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct." *Crawford-El v. Britton*, 523 U.S. 574, 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); *see also Cotarelo*, 460 F.3d at 253 ("Even if the evidence . . . were deemed sufficient to allow a trier of fact to find that [plaintiff's] speech was a factor in the [adverse employment decision], [defendants] may still prevail on a motion for summary judgment if they can demonstrate as a matter of law that they would have taken the same adverse action if the protected speech had not occurred."). Here, even if plaintiff was able to put forth evidence to establish a claim of First Amendment retaliation, defendants have demonstrated that they would have taken the same adverse action against the plaintiff, regardless of the plaintiff's speech. The record is replete with uncontroverted examples of plaintiff's misconduct such that there is no genuine issue of material fact as to whether defendants would have terminated plaintiff regardless of his speech. In plaintiff's first evaluation, in May 1999, it was noted that plaintiff needed to develop a more tactful relationship with service providers. After that date, there was a pattern of complaints against plaintiff. The record indicates that defendants were amenable to assisting plaintiff to develop the appropriate professional behavior through additional training and weekly supervised

---

[2] Plaintiff devotes a significant portion of his opposition to highlighting some of the various statements made concerning plaintiff's negative job performance. Plaintiff makes clear that he was dissatisfied with certain administrative procedures, as well as with the services being provided to children that he believed were unwarranted. However, none of this evidence demonstrates retaliation by defendants; rather, plaintiff merely confirms his failure to follow procedures and the resulting documentary evidence of his poor job performance. Accordingly, plaintiff's conclusory assertions of a conspiracy against plaintiff based on this evidence lack merit. None of this evidence, viewed in a light most favorable to plaintiff, indicates that plaintiff was speaking out regarding alleged preferential treatment of Orthodox providers or that his supervisors were retaliating against him. Instead, the evidence demonstrates that plaintiff was not following procedures or adequately performing his job. Even assuming plaintiff's behavior was motivated by plaintiff's concern regarding the preferential treatment, there is no evidence that this excuse for the behavior was communicated to defendants. Plaintiff merely consistently informed defendants that he believed parents were abusing the system and receiving too many services for their children.

[3] To the extent plaintiff attempts to establish that defendants engaged in a pattern or practice of terminating employees who engaged in protected speech, that claim must fail. Plaintiff sets forth no admissible evidence in support of a claim of widespread acts of retaliation against individuals. *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 158 (2d Cir. 2001) ("To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'") *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977)).

sessions. However, plaintiff's inappropriate behavior continued. Plaintiff does not argue that he did not engage in the behavior that resulted in the disciplinary discussions; rather, it appears plaintiff attempts to defend his actions. The complaints against plaintiff came not only from plaintiff's supervisors, but also from parents and other social workers with whom plaintiff interacted. Specifically, as described more fully *supra*, there were incidents on March 28, 2001, April 3, 2001, July 19, 2001, and July 31, 2001. (Eck. Decl. Exs. C-K.) After an informal hearing on October 10, 2001, a hearing officer recommended plaintiff's termination. (*Id.*) Accordingly, the Court finds that defendants have shown that, regardless of any alleged protected conduct by plaintiff, defendants would have terminated plaintiff. *See Martinez v. Texas Dept. of Criminal Justice*, 300 F.3d 567, 577 (5th Cir. 2002) (reversing district court's denial of summary judgment where defendants showed they would have terminated plaintiff regardless of speech).

In sum, after a careful review of all of the evidence put forth by defendants and *pro se* plaintiff, the Court finds that a reasonable jury could only conclude that (1) there is no causal connection between plaintiff's termination and any protected conduct, and (2) even if the protected speech was a motivating factor in the employment decision, plaintiff would have been terminated absent the protected conduct.[4] The Court recognizes that it must proceed with great caution in granting summary judgment in cases such as this where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, a plaintiff cannot survive summary judgment "where the moving party has submitted facts sufficient to show that the non-moving party's claim has no merit, and the non-moving party's attempt to rebut the movant's facts consist only of 'mere allegations or denials' of the facts asserted by the movant." *Forsyth*, 409 F.3d at 570; *see also Cotarelo*, 460 F.3d at 254 (finding summary judgment for defendant proper on plaintiff's First Amendment retaliation claim). This is precisely such a case. Drawing all reasonable inferences in plaintiff's favor and interpreting his papers to raise the strongest arguments they suggest, there is simply insufficient evidence for plaintiff to survive a summary judgment motion in the instant case.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 8, 2006
Central Islip, NY

\* \* \*

Plaintiff appeared *pro se*. Attorneys for defendants are Ilana A. Eck, Assistant Corporation Counsel, Michael A. Cardozo,

---

[4]Defendants Weisenfreud and Davison additionally move for summary judgment on the basis of qualified immunity, and defendant EIP also argues that it may not be sued in its independent capacity. However, because plaintiff has failed to establish a violation of any constitutional right, the Court need not consider these arguments.

Corporation Counsel of the City of New York,
100 Church Street, Room 2-318, New York,
New York 10007.